**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
:
ELSIE TORRES,                          :
:
        Plaintiff,                     :
:                    Civil Action No. 07-1951 (JAG)
            v.                         :
:                        **OPINION**
COMMISSIONER OF SOCIAL                 :
SECURITY,                              :
:
        Defendant.                     :
_____:


**GREENAWAY, JR., U.S.D.J.**

Plaintiff Elsie Torres ("Plaintiff") seeks review of the Social Security Commissioner's

(the "Commissioner") decision denying her applications for Supplemental Security Income

("SSI")[1] and Disability Income Benefits ("DIB")[2], pursuant to 42 U.S.C. §§ 1383(c)(3) and

405(g),[3]  Plaintiff argues that the decision is not supported by substantial evidence, as required by

§ 405(g), and that the Commissioner erred as a matter of law in denying her applications.  For the

_____

[1] Supplemental Security Income is a national program that provides supplemental security income to individuals who have attained age 65 or are blind or disabled.  42 U.S.C. § 1381.

[2] DIB are awarded only when a claimant with a sufficient number of quarters of insured employment has suffered such a mental or physical impairment that the claimant cannot perform substantial gainful employment for at least twelve months.  20 C.F.R. § 404.1520.

[3] These sections of the Social Security Act (the "Act") provide that any individual may obtain a review of any final decision of the Secretary of Health and Human Services made subsequent to a hearing to which he or she was a party.  The federal district court for the district in which the plaintiff resides is the appropriate place to bring such an action.  42 U.S.C. § 405(g).

reasons set forth below, this Court finds that the Commissioner's decision is supported by

substantial evidence and shall be affirmed.

## **PROCEDURAL HISTORY**

On May 31, 2002, Plaintiff filed an application for Disability Insurance Benefits.  (Tr.

18).)[4]  On April 4, 2003, she submitted a claim for Supplemental Security Income payments.

The claims were denied both initially and on reconsideration, and Plaintiff filed a timely request

for a hearing.

On March 9, 2005, the hearing before Administrative Law Judge Joel H. Friedman ("ALJ

Friedman").  Plaintiff appeared and testified at the hearing.  ALJ Friedman issued a decision on

June 24, 2005, finding that Plaintiff was not eligible for DIB or SSI benefits based upon her

disabilities.  (Tr. 26.)  The following is a summary of his findings:

1.  The claimant meets the nondisability requirements for a period of disability and
    Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act
    and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset
    of disability.

3.  The claimant's intermittent explosive temper disorder, asthma and degenerative
    disc disease are considered "severe" based on the requirements in the Regulations
    20 C.F.R. §§ 404.1520(c) and 416.920(c).

4.  These medically determinable impairments do not meet or medically equal one of

---

[4]  The Act instructs the Secretary to file, as part of the answer, a certified copy of the
transcript of the record, including any evidence used to formulate the conclusion or decision. 42
U.S.C. § 405(g).  " Tr." refers to said transcript.

2

the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.     The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.     The claimant has the following residual functional capacity: a range of light work.

7.     The claimant is unable to perform any of her past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

8.     The claimant is a "younger individual between the ages of 18 and 44" (20 C.F.R. §§ 404.1563 and 416.963).

9.     The claimant has "a limited education" (20 C.F.R. §§ 404.1564 and 416.964).

10.    The claimant has no transferable skills from any past relevant work (20 C.F.R. §§ 404.1568 and 416.968).

11.    The claimant has the residual functional capacity to perform a significant range of light work (20 C.F.R. §§ 404.1567 and 416.967).

12.    Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.17 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs include work as a parts sorter, inspector, garment folder, and labeling machine operator.

13.    The claimant was not under a "disability", as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

(Tr. 25-26.)

3

Based on these findings, ALJ Friedman concluded that Plaintiff was not entitled to a period of disability, DIB Benefits, or SSI Payments under §§ 216(i), 223, 1602, and 1614(a)(3)(A), respectively, of the Social Security Act.  (Tr. 26.)  Plaintiff sought review by the Appeals Council; however, the Appeals Council, in a letter dated February 23, 2007, concluded there were no grounds for review, and that the decision of the ALJ was the final decision of the Commissioner.  (Tr. 6-8.)  Pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g), Plaintiff filed the instant action, seeking reversal of the Commissioner's decision.

## II. STATEMENT OF FACTS

A.   **Background**

Plaintiff Elsie Torres was born on November 27, 1958.  (Tr. 24.)  She currently lives in Jersey City, New Jersey.  (Tr. 252.)  She attended school through the seventh grade and is able to communicate in English.  (Tr. 253.)  Plaintiff has a varied work history, with past work as a maintenance person, housekeeper, babysitter, and superintendent.  (Tr. 24.)  She worked consistently until 2000, when she left her maintenance job due to a dispute with her supervisor.  (Tr. 19.)  Plaintiff alleges that she became disabled on November 10, 2000, due to asthma, back pain, and a psychiatric impairment.  (Id.)

B.   **Medical Evidence**

1.   Emergency Room Records

On January 28, 2000, Plaintiff visited the emergency room at Christ Hospital in Jersey City, New Jersey complaining of a cough, fever, myalgia[5], and wheezing.  (Tr. 126.)  She was

---

[5] Myalgia is defined as a "diffuse muscle pain, usually accompanied by malaise." MOSBY'S MEDICAL, NURSING & ALLIED HEALTH DICTIONARY 1136 (6th ed. 2002) [hereinafter "MOSBY'S"].

treated with aerosolized albuterol and IV steroids, which eliminated her wheezing and respiratory distress.  (Id.)  She was diagnosed with asthmatic bronchitis.[6]  (Tr. 127.)

On February 8, 2001, Plaintiff visited the emergency room at Greenville Hospital in Jersey City, New Jersey complaining of tightness in her chest and a persistent cough.  (Tr. 133.) She was diagnosed with an acute attack of bronchial asthma, treated with medication, and released.  (Tr. 132.)

### 2.    Dr. Romolo Maurizi

On April 1, 2002, Dr. Romolo Maurizi, a radiologist, evaluated Plaintiff through a Diagnostic Imaging Examination.  (Tr. 138.)  The Examination revealed (1) marked levoscoliosis;[7] (2) hypertrophy[8] of the articulating facets causing stenosis[9] at all levels bilaterally; (3) osteoarthritis;[10] and (4) mild disc bulging causing mild spondylitic[11] changes.  (Id.)

### 3.    Dr. Arthur H. Tiger

On November 19, 2002, Dr. Arthur H. Tiger, an orthopedic surgeon, examined Plaintiff

---

[6] Asthmatic bronchitis is an "inflamation and swelling of the mucous membrane of the bronchi in a patient with asthma."  MOSBY'S at 148.

[7] Scoliosis is defined as "lateral curvature of the spine."  MOSBY'S at 1000.  Levo is a prefix meaning "left".  MOSBY'S at 1000.

[8] Hypertrophy is defined as "an increase in the size of an organ caused by an increase in the size of the cells rather than the number of cells."  MOSBY'S at 851.

[9] Stenosis is defined as "an abnormal condition characterized by the constriction or narrowing of an opening or passageway in a body structure."  MOSBY'S at 1630.

[10] Osteoarthritis is defined as "a form of arthritis in which one or many joints undergo degenerative changes."  MOSBY'S at 1241.

[11] Spondylitis is "an inflammation of any of the vertebrae."  Spondylitic means "pertaining to a person with spondylitis."  MOSBY'S at 1619.

in his office.  (Tr. 151.)  He noted that Plaintiff has ongoing lower back pain and a history of asthma.  (Id.)  Dr. Tiger's examination revealed moderate loss of lumbar lordotic curvature, with areas of hard fibrotic muscle tissue present on both sides of the lower lumbar spine.  (Tr. 152.) He found tenderness to palpation[12] over the L3, L4, and L5 vertebral spinal processes, multiple areas of trigger point tenderness present on both sides of the lower lumbar spine, and tenderness to palpation over both SI joints.  (Id.)

Dr. Tiger opined that Plaintiff has the residuals of a chronic lumbosacral[13] strain syndrome with chronic myofascitis[14] with multiple levels of degenerative and bulging discs and evidence of spinal stenosis.  (Id.)  He estimates Plaintiff's disability at 33 1/3% of partial total. (Id.)

    4.    <u>Dr. Manola A. Tejada</u>

From January 3, 2003, to June 11, 2003, Dr. Manola A. Tejada, a chiropractor, examined Plaintiff two times per week.  (Tr. 153.)  In a report dated June 11, 2003, Dr. Tejada notes that the Plaintiff has a history of lower back pain, with some numbness in her left leg and occasional weakness.  (Id.)  Upon his initial examination, Dr. Tejada found a marked decrease in the range of motion in Plaintiff's cervical and lumbar spine.  (Id.)  As of the June 11, 2003 report, Dr.

---

[12] Palpation is "a technique used in [a] physical examination in which the examiner feels the texture, size, consistency, and location of certain body parts with the hands."  MOSBY'S at 1266.

[13] Lumbosacral means "pertaining to the lumbar vertebrae and the sacrum."  MOSBY'S at 1026.

[14] Myofascial is defined as "pertaining to a muscle and its sheath of connective tissue, or fascia."  MOSBY'S at 1145.  The suffix "itis" means "an inflamation of a specified organ." MOSBY'S at 938.

Tejada opined that Plaintiff could lift and carry no more than 5 pounds of weight at a time, and could stand or walk for less than 2 hours per day.  (Tr. 155.)  Plaintiff's range of motion in the lumbar and cervical spine were significantly limited, and the muscles in her lumbar spine were weaker than normal.  (Tr. 159.)

Dr. Tejada diagnosed Plaintiff with acute lumbar and cervical subluxation[15], myalgia, myositis[16], neuralgia[17], and hypoesthesia.[18]  (Tr. 155.)  Her response to treatment by Dr. Tejada was temporary relief lasting into the day following their sessions.  (Id.)

5.      Dr. Rohit Khanna

On June 16, 2003, Dr. Rohit Khanna, a psychiatrist, examined Plaintiff.  (Tr. 160.)  Dr. Khanna noted that Plaintiff reported feeling depressed during the preceding year, with associated symptoms including trouble sleeping, nightmares, fatigue, crying spells, and trouble concentrating.  (Id.)  Plaintiff also reported panic attacks and trouble controlling her anger.  (Id.)

Based upon this examination, Dr. Khanna diagnosed Plaintiff with major depressive disorder, panic disorder, a crooked spinal column, asthma, arthritis, and disk disease of the spinal

---

[15] Subluxation, also called incomplete dislocation, is "a partial abnormal separation of the articular surfaces of a joint."  MOSBY'S at 1647, 883.

[16] Myositis is "an inflamation of muscle tissue, usually of voluntary muscle."  MOSBY'S at 1146.

[17] Neuralgia is "an abnormal condition characterized by severe stabbing pain, caused by a variety of disorders affecting the nervous system."  MOSBY'S at 1171.

[18] Hypoesthesia, also called hypesthesia, is "a decrease in sensation in response to stimulation of the sensory nerves or body organs or areas they innervate."  MOSBY'S at 854, 852.

column.  (Tr. 162.)  Dr. Khanna opined that Plaintiff has a GAF[19] score of 60, and is capable of handling her own monetary funds.  (Id.)

       6.    Drs. M. Apacible and Nenuca Bustos

On June 23, 2003, Drs. Apacible and Bustos, medical consultants for the Division of Disability Services ("DDS"), issued a Mental Residual Functional Capacity Assessment[20] for Plaintiff.  (Tr. 179-181.)  They assessed Plaintiff as having mild restriction of her activities of daily living, moderate difficulties with respect to social functioning and maintaining concentration, persistence and pace and no evidence of episodes of decompensation due to her depression and her anxiety disorder.  (Tr. 181.)

       7.    Dr. L. Vassallo

On June 30, 2003, Plaintiff was examined by Dr. L. Vassallo, an orthopedist.  (Tr. 197.) Dr. Vassallo noted that Plaintiff walks without a limp and is able to sit comfortably.  (Tr. 198.) She is able to bend her back in order to remove her shoes, walk on her tip toes and squat. (Id.) The range of motion in her spine is limited, though she exhibits full range of motion in her

---

[19] A GAF scale tracks "the clinical progress of individuals in global terms." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: FOURTH EDITION 32 (Text Revision 2000).  "The GAF Scale is to be rated with respect only to psychological, social, and occupational functioning." Id.  A GAF scale ranges from 0-100. Id. at 34.  Generally, a lower score indicates a more serious mental disorder.  A score of 0 stands for "inadequate information," and a score of 100 indicates "[s]uperior functioning in a wide range of activities." Id. A GAF score of 60 indicates "EITHER moderate symptoms OR moderate difficulty in social, work, or school functioning." Id.  (emphasis in original).

[20] A Mental Residual Functional Capacity Assessment is a form used to determine the extent of a claimant's disability, and consists of 3 parts.  Part 1 contains a series of boxes to be checked by a physician, indicating the physician's summary conclusions with respect to a given patient in 20 different areas.  Part 2 is a space for remarks on areas in which there was a lack of evidence from which to draw a conclusion in Part 1.  Part 3 contains the physician's conclusions in narrative form.

shoulders, elbows, and wrists.  (Id.)  Plaintiff is able to manipulate objects with her hands, and the muscle strength in her extremities is good.  (Id.)

Dr. Vassallo concluded that Plaintiff suffers from chronic back pain, but has no neurological deficit in her extremities.  (Id.)  She can use both hands for fine and gross manipulation, and does not require a hand-held assistive device for ambulation.  (Id.)

8.     Dr. I. Rampello

On July 8, 2003, Dr. Rampello, a DDS physician, issued a Physical Residual Functonal Capacity Assessment for Plaintiff.  (Tr. 201.)  The assessment is based upon the medical record to date, incorporating data from hospital visits and the opinions of Dr. Tejada, a chiropractor, and Dr. Vassallo, an orthopedist.  (Tr. 202-03.)  Dr. Rampello concluded that Plaintiff would be able to occasionally lift or carry objects weighing 20 pounds, and frequently lift or carry objects weighing 10 pounds.  (Tr. 202.)  He concluded that Plaintiff would be able to stand or walk for about 6 hours in an 8 hour workday, and be able to remain seated for about 6 hours in an 8 hour workday.  (Id.)  Dr. Rampello rated her ability to push and pull objects as unlimited.  (Id.)

The sole environmental limitation Dr. Rampello noted  was that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  (Tr. 205.)  This limitation is due to Plaintiff's history of bronchial asthma.  (Id.)  In reaching his conclusions, Dr. Rampello gave controlling weight to Dr. Vassallo.  (Tr. 207.)

9.     Dr. Carmelo Pingol

On July 10, 2003, Dr. Carmelo Pingol, a psychiatrist, examined Plaintiff.  (Tr. 209.)  Dr. Pingol diagnosed Plaintiff with intermittent explosive disorder, antisocial personality disorder, a dislocated lumbar disk, and arthritis of her feet.  (Tr. 211.)  He placed Plaintiff's GAF score in

9

the 51-60 range.  (Id.)

Dr. Pingol indicated that Plaintiff did not exhibit any signs of psychomotor abnormality. He described her as being verbal and reliable, pleasant and cooperative, alert, coherent, relevant and goal directed.  (Tr. 210.)  Plaintiff denied suicidal or homicidal ideation, as well as auditory, visual, or tactile hallucinations.  (Id.)  Dr. Pingol stated that Plaintiff's memory was intact, her attention and concentration were "okay", and that she was able to focus for the whole hour of evaluation.  (Id.)

On February 17, 2005, Dr. Pingol filled out a psychiatric/psychological report based upon his treatment of Plaintiff from July, 2003 to February 15, 2005.  (Tr. 221.)  His diagnoses remained largely the same as they had been on July 10, 2003, though he noted improvement with Plaintiff's anger issues, placed her GAF score in the 61-70 range, and described Plaintiff's prognosis as "fair".  (Id.)  Dr. Pingol described Plaintiff's mental abilities and aptitude needed to do unskilled work as "fair" or "good" in all categories, save the ability to accept instructions, respond appropriately to criticism from supervisors, and get along with co-workers or peers.  (Tr. 223.)  He rated Plaintiff's abilities in those categories as "poor or none".  (Id.)

10.    Dr. Humberto T. Perez

On January 20, 2005, Dr. Humberto T. Perez, a family practitioner, issued a physician report for Plaintiff's claim of disability.  (Tr. 216.)  He diagnosed Plaintiff with chronic bronchial asthma, chronic back pain, and severe neuropsychosis.  (Id.)  She had pain in all major joints. (Tr. 217.)  Dr. Perez found that Plaintiff had a limited range of motion in her cervical and lumbosacral spine, and was unable to sleep due to joint pain and shortness of breath.  (Id.)  In his opinion, Plaintiff's walking range is limited to 1 block without rest or severe pain, she cannot sit

10

or stand for more than 20 minutes at a time, and cannot sit or stand for more than 20 minutes

total in an 8 hour work day.  (Id.)

Dr. Perez also found that Plaintiff is incapable of carrying even light objects (less than 10

pounds) in a competitive work situation, though she did not have significant limitations in

reaching, handling, or fingering.  (Tr. 218.)  In addition to these limitations, Dr. Perez stated that

Plaintiff must avoid all exposure to extreme cold or heat, high humidity, fumes, odors, dust,

gases, perfumes, cigarette smoke, soldering fluxes, solvents and cleaners, chemicals, and other

irritants or allergens.  (Tr. 219.)

## C.      Plaintiff's Testimony at ALJ Hearing

In the administrative hearing held on March 9, 2005, Plaintiff testified that she is unable

to work because of her asthma, regular pain in her back and legs, and her issues with anger.  (Tr.

253.)  She said that her last regular employment was a job performing maintenance in an office

building, which she ceased to perform in November, 2000.  (Tr. 259.)  Her duties at that job

included pushing a cart, and lifting boxes which she described as weighing 10 to 20 pounds.

(Id.)  The cart would be loaded with as many as 5 or 6 boxes at a time.  (Id.)  Plaintiff left her

maintenance job because of a dispute with her supervisor.  (Id.)  Since that time, Plaintiff has

performed work as a babysitter and done work as a custodian in her apartment building.  (Tr.

260.)  She testified that by 2003, she was forced to cease performing those jobs as well because

of her health issues.  (Tr. 260-61.)   She continues to work in her apartment building, though that

work is now limited to collecting the rent checks from other tenants and notifying the owner

when there are maintenance issues in the building.  (Tr. 262.)  In exchange for these services,

Plaintiff receives credit toward her rent.  (Tr. 261-62.)

11

Plaintiff testified that she gets asthma attacks "all the time", and that she regularly uses her "pump" and medications to alleviate her suffering.  (Tr. 254.)  She ceased smoking 5 to 6 years prior to the hearing.  (Id.)  Plaintiff testified that she is able to walk, but her range is limited to 2 blocks due to her asthma.  (Tr. 265.)  She is unable to stand for periods in excess of 20 minutes without pain in her back and numbness in her legs.  (Tr. 266.)  Plaintiff is able to shop for groceries, but cannot go alone because she is unable to carry the bags home.  (Tr. 264.)

Under questioning from her representative, Plaintiff testified that she experiences pain in her hands and arms, which makes it difficult for her to hold things in her hands.  (Tr. 269-70.)  She said that she has experienced depression since the age of 14, which causes significant mood swings and bouts of anger or fits of crying.  (Tr. 271-72.)  Plaintiff testified that she experiences auditory hallucinations on a daily basis.  (Tr. 272.)

## D.    Testimony of Vocational Expert, Mr. Rocco J. Meola

Rocco J. Meola testified as a vocational expert at the March 9, 2005 hearing.  (Tr. 275.)  Mr. Meola described Plaintiff's past work doing building maintenance and housekeeping as medium[21] and unskilled.  (Tr. 276.)  He described her babysitting work as light[22] and unskilled,

---

[21] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

[22] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

12

and her work as a superintendent as medium and generally unskilled, possibly rising to the level of semi-skilled.  (Tr. 276-77.)

ALJ Friedman asked Mr. Meola to determine, hypothetically, what types of work a person Plaintiff's age, with her past education, work experience, physical and psychological limitations, would be able to perform if found capable of the demands of light work, as defined in the regulations.  (Tr. 277-78.)  Mr. Meola opined that while such a person would be unable to perform the jobs Plaintiff has held in the past, that person could be qualified for work as a parts sorter, inspector, garment folder, or labeling machine operator.  (Tr. 279.)  He estimated that there were 1,500 such jobs in the region, and in excess of 50,000 such jobs nationally.  (Id.)

ALJ Friedman then posed a similar hypothetical, limiting the available jobs to sedentary[23] work.  (Id.)  Mr. Meola responded that parts tester, parts cleaner, wire worker, assembler, and bench worker would all fit within the hypothetical.  (Id.)  He estimated that there are between 1,000 and 1,200 such jobs regionally, and approximately 45,000 jobs nationally.  (Id.)

### III. DISCUSSION

**A.    Standard of Review**

This Court has jurisdiction to review the Commissioner's decision, pursuant to 42 U.S.C. § 405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial

---

[23] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence "is more than a mere scintilla of evidence but may be less than a preponderance." Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing Stunkard, 841 F.2d at 59). The reviewing court must consider the totality of the evidence and then determine whether there is substantial evidence to support the Commissioner's decision. See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981). Furthermore, the reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

In determining whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; (4) the claimant's educational background, work history and present age." Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981). Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence which may also support a different conclusion. Blalock, 483 F.2d at 775.

## B.   Statutory Standards

The claimant bears the initial burden of establishing his or her disability. 42 U.S.C. § 423(d)(5). To qualify for DIB or SSI benefits, a claimant must first establish that he is needy

14

and aged, blind, or "disabled."  42 U.S.C. § 1381.  A claimant is deemed "disabled" under the

Act if he is unable to "engage in substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of no less than [twelve] months."  42

U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Disability

is predicated on whether a claimant's impairment is so severe that he "is not only unable to do

his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy."  42 U.S.C.

§ 423(d)(2)(A); see also Nance v. Barnhart, 194 F. Supp. 2d 302, 316 (D. Del. 2002).  Finally,

while subjective complaints of pain are considered, alone, they are not enough to establish

disability.  42 U.S.C. § 423(d)(5)(A).  An impairment only qualifies as a disability if it "results

from anatomical, physiological or psychological abnormalities which are demonstrable by

medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

**C.**     **The Five Step Evaluation Process and the Burden of Proof**

Determinations of disability are made by the Commissioner, pursuant to the five-step

process outlined in 20 C.F.R. § 404.1520.  At the first step of the review, the Commissioner must

determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R.

§ 404.1520(b).  If a claimant is found to be engaged in such activity, the claimant is not

"disabled" and the disability claim will be denied.  Id.; Bowen v. Yuckert, 482 U.S. 137, 141

(1987).

At step two, the Commissioner must determine whether the claimant suffers from a

severe impairment.  20 C.F.R. § 404.1520(a)(ii)(c).  An impairment is severe if it "significantly

limits [a claimant's] physical or mental ability to do basic work activities."  Id.  In determining

15

whether the claimant has a severe impairment, the age, education, and work experience of the claimant will not be considered.  See id.  If the claimant is found to have a severe impairment, the Commissioner addresses step three of the process.

At step three, the Commissioner compares the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1594(f)(2).  If the claimant's impairment(s) meets or equals one of the listed impairments, he will be found disabled under the Social Security Act.  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the Third Circuit found that to deny a claim at step three, the ALJ must specify which listings[24] apply and give reasons why those listings are not met or equaled.  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the Third Circuit noted that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.  Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  Id.  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing."  Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform his past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is able to

---

[24] Hereinafter "listing" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

perform his past relevant work, he will not be found disabled under the Act.  In <u>Burnett</u>, the

Third Circuit set forth the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional
> capacity enables her to perform her past relevant work. This step involves three
> substeps: (1) the ALJ must make specific findings of fact as to the claimant's
> residual functional capacity; (2) the ALJ must make findings of the physical and
> mental demands of the claimant's past relevant work; and (3) the ALJ must
> compare the residual functional capacity to the past relevant work to determine
> whether claimant has the level of capability needed to perform the past relevant
> work.

<u>Burnett</u>, 220 F.3d at 120.  If the claimant is unable to resume his past work, and his condition is

deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must

demonstrate that there are other jobs existing in significant numbers in the national economy

which the claimant can perform, consistent with his medical impairments, age, education, past

work experience, and residual functional capacity.  20 C.F.R. § 404.1560(c)(1).  If the ALJ finds

a significant number of jobs that the claimant can perform, claimant will not be found disabled.

<u>Id.</u>

When the claimant has only exertional limitations, the Commissioner may utilize the

Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet the

burden of establishing the existence of jobs in the national economy.  These guidelines dictate a

result of "disabled" or "not disabled" according to combinations of vocational factors, such as

age, education level, work history, and residual functional capacity.  These guidelines reflect the

administrative notice taken of the jobs in the national economy that exist for particular

combinations of vocational factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph

200.00(b).  When a claimant's vocational factors, as determined in the preceding steps of the

evaluation, coincide with a combination listed in Appendix 2, the guideline directs a conclusion as to whether an individual is disabled.  20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458, 462 (1983).  The claimant may rebut any finding of fact as to a vocational factor.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner "must analyze the cumulative effect of the claimant's impairments in determining whether she is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  Moreover, "the combined impact of the impairments will be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 1523; Parker v. Barnhart, 244 F. Supp. 2d 360, 369 (D. Del. 2003).  However, the burden still remains on the Plaintiff to prove that the impairments in combination are severe enough to qualify him for benefits.  See Williams v. Barnhart, 87 F. App'x 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show how a combination-effects analysis would have resulted in a qualifying disability); see also Marcus v. Barnhart, No. 02-3714, 2003 WL 22016801, at *2 (E.D. Pa. June 10, 2003) (stating that "the burden was on [Plaintiff] to show that the combined effect of her impairments limited one of the basic work abilities").

While Burnett involved a decision in which the ALJ's explanation of his step three determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit applies its procedural requirements, as well as their interpretation in Jones, to every step of the decision.  See, e.g., Rivera v. Commissioner, 164 F. App'x 260, 262 (3d Cir. 2006).  Thus, at every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review," but need not "adhere to a particular format."  Id.

**D.    ALJ Friedman's Findings**

18

ALJ Friedman applied the five step evaluation process and determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. 30.)

### 1.      *Step One*

Regarding step one, ALJ Friedman found that Plaintiff had "not engaged in substantial gainful activity since her alleged onset date."  (Tr. 19.)

### 2.      *Step Two*

With respect to step two, ALJ Friedman found that Plaintiff suffered from asthma, degenerative disk disease, and intermittent explosive temper disorder which have resulted in significant limitations in work related physical and mental functioning and are therefore severe within the meaning of the Social Security Act.  (Tr. 19.)

### 3.      *Step Three*

ALJ Friedman concluded, regarding step three, that Plaintiff's impairments are not "'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  (Tr. 20.)  ALJ Friedman reasoned that the requirement of Listing 1.04 was not met because the evidence does not show that Plaintiff's degenerative disk disease involves compromise of a nerve root.  (Id.)  The requirements of Listing 3.03 were not met because she does not experience frequent asthma attacks requiring doctor intervention.  (Id.)  ALJ Friedman found that Plaintiff's mental problems had improved with treatment and do not result in limitations in the areas of functioning set forth in the "B" criteria to Listing 12.04 or 12.06.  (Id.)  In addition to a failure to reach the "B" criteria, ALJ Friedman found that Plaintiff does not satisfy the "C" criteria of those listings either, because she had "only mild restriction of her activities of daily living, moderate difficulties with respect to social functioning and maintaining concentration, persistence and pace

19

and no evidence of episodes of decompensation due to her depression and her anxiety (panic) disorder (Exhibit 11F)."

### 4.   *Step Four*

ALJ Friedman concluded that Plaintiff is unable to perform any of her past relevant work. (Tr. 25.)  He determined that Plaintiff's residual functional capacity would allow her to perform "light work ... lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  (Tr. 24.)  ALJ Friedman added that jobs in this category may require a "good deal of walking or standing" and may involve "sitting most of the time with some pushing and pulling of arm or leg controls".  (Id.)  He noted that if someone can do light work, then they can also do sedentary work in the absence of additional limiting factors like the loss of fine dexterity or the inability to sit for long periods.  (Id.)

In reaching this conclusion, ALJ Friedman relied on Plaintiff's medical history.  The ALJ found that "there was diagnostic evidence of degenerative disc disease and asthma which would have made it sufficiently difficult for the claimant to meet the exertional demands of work in regards to standing, walking, lifting and carrying so as to have necessarily precluded her from engaging in work activity beyond the light exertional level."  (Tr. 23.)  Plaintiff's past work generally involved tasks which require a medium exertional level.  (Tr. 24.)  If the claimant is unable to resume her past work, and her condition is deemed "severe," yet not listed, the evaluation moves to the final step.

### 5. *Step Five*

With respect to step 5, ALJ Friedman concluded that Plaintiff is "not disabled" within the

framework of Medical-Vocational Rule 202.17.[25]  (Tr. 25.)  While Plaintiff may not be able to

perform the work she has in the past, considering the Plaintiff's age, education, work experience,

and residual functional capacity, using the Medical-Vocational Guidelines, 20 C.F.R. Part 404,

Subpart P, Appendix 2, and relying on the expert testimony of the vocational expert, Mr. Rocco

Meola, ALJ Friedman concluded that Plaintiff  retains the capacity to do work that exists in

significant numbers in the national economy.  (Tr. 24.)  Given a hypothetical involving a person

with limitations similar to Plaintiff's, Mr. Meola testified that she could perform jobs such as

parts sorter, inspector, garment folder, and labeling machine operator.  Mr. Meola estimated that

there were 50,000 such jobs nationally and 1,500 in the region.  (Id.)  Given a capacity for

sedentary work and subject to the same limitations, Mr. Meola opined that a person in Plaintiff's

situation would have the capacity to work as a parts tester, parts cleaner, wire worker, assembler

and bench worker.  Mr. Meola estimated that there were 45,000 such jobs nationally and 1000 to

1200 in the region.  (Id.)

**E.**     **Analysis**

Plaintiff contends that ALJ Friedman's decision should be reversed and that Plaintiff

should be awarded the benefits applied for or in the alternative, the case should be remanded (Br.

In Support of Pl. 13 [hereinafter "Pl.'s Br."] ), because the ALJ's decision was not supported by

substantial evidence.  (Id.)  Specifically, Plaintiff argues that the ALJ's decision was predicated

on vocational expert, Mr. Meola's response to the first hypothetical posed by ALJ Friedman at

---

[25] The Medical-Vocational Guidelines are used as a framework for the decision when the claimant cannot perform all of the exertional demands of work at a given level of exertion and/or has any non-exertional limitations. 20 C.F.R. Part 404, Subpart P, Appendix 2.  Rule 202.17 corresponds to a younger individual, who is at least literate and able to communicate in English, and whose previous work was unskilled.  Id.

the administrative hearing and that this hypothetical was inconsistent with the evidence, whereas ALJ Friedman's second hypothetical prompted Mr. Meola to respond that Plaintiff could not work.  (Pl.'s Br. 14.)

This Court finds that there is substantial evidence to support ALJ Friedman's determination.  Plaintiff's arguments are not persuasive.

### 1.     **ALJ Friedman's Analysis was Supported by Substantial Evidence.**

ALJ Friedman's decision turned on the fifth step of the sequential evaluation.  (Tr. 23-24.)  In order to make his evaluation, the ALJ presented a hypothetical claimant for Mr. Meola to consider and determine whether such a person could find work in the economy.  Plaintiff contends that this hypothetical was defective because it (1) did not accurately reflect Plaintiff's condition, (2) relied exclusively on Exhibit 10 F, inappropriately rejecting the opinion of Plaintiff's treating psychiatrist.  (Pl.'s Br. 14-21.)

Plaintiff takes issue with the portion of the hypothetical in which the hypothetical claimant is described as someone who "would be limited to routine repetitive tasks in the low stress and low public contact setting and counsellor, that's 10F those last."  (Pl.'s Br. 19, quoting Tr. 277-78.)  The quoted language was derived by the ALJ from Exhibit 10 F, which is the Mental Residual Functional Capacity Assessment completed by DDS psychiatrists.[26]  Plaintiff contends that the ALJ ignored many of the specific findings of that assessment in posing the hypothetical to Mr. Meola.  (Id.)  Plaintiff specifically mentions 8 moderate limitations noted in Exhibit 10 F.  (Pl.'s Br. 20.)

---

[26] Exhibit 10 F is Plaintiff's Mental Residual Functional Capacity Assessment, completed by Drs. Apacible and Bustos, physicians employed by the New Jersey Department of Human Services Division of Disability Services.

In a subsequent hypothetical, ALJ Friedman asked Mr. Meola to consider additional restrictions in which a claimant might have "difficulty due to psychological or pain maintaining concentration, persistence, and pace even on simple jobs." (Tr. 282.) At this point, the vocational expert responded that such limitations would prevent such a person from working. (Id.) On the basis of the second hypothetical, and Mr. Meola's response, Plaintiff contends that the ALJ selectively ignored the specific circumstances of the Plaintiff in determining that she is capable of working, and that the ALJ's hypothetical reflected "unfavorable medical evidence that is overwhelmed by the other medical evidence in the record." (Pl.'s Br. 21-22.)

### A.      The Hypothetical Accurately Reflected Plaintiff's Condition

ALJ Friedman's analysis did not, in fact, ignore Plaintiff's condition. As is noted above, the first hypothetical did not assume that the hypothetical claimant would have difficulty maintaining attention, concentration, persistence, and pace, while the second hypothetical did assume such difficulties. Plaintiff does not have trouble maintaining attention, concentration, persistence, and pace. On the last page of Exhibit 10 F (Tr. 181), Drs. Bustos and Apacible concluded that Plaintiff was able to maintain attention, concentration, persistence and pace, and could perform routine, repetitive tasks in a low stress, low contact public setting. With respect to the limitations from the assessment, the omission which Plaintiff takes issue with, the psychological limitations indicated in Exhibit 10 F are "moderate", and none were noted as "marked". In any event, as the Defendant's Brief Pursuant to Local Civil Rule 9.1 ("Defendant's Brief") points out, pursuant to the Program Operations Manual System ("POMS"), the check blocks in Section I of the assessment do not constitute the assessment itself, but function rather as a worksheet to aid the physician in making an assessment. See POMS DI 24510.060. Therefore, the ALJ's hypothetical accurately reflected Drs. Bustos and Apacible's opinion of

Plaintiff's condition.

**B.**   **ALJ Friedman's Analysis Did Not Rely Exclusively on Exhibit 10 F, Nor Did He Inappropriately Reject the Opinion of Plaintiff's Treating Psychiatrist**

ALJ Friedman's analysis did not rely exclusively on Exhibit 10 F, nor did it ignore the opinion of Plaintiff's treating psychiatrist, Dr. Pingol, who treated Plaintiff from July 2003 to February 2005.  The ALJ cited specifically to Dr. Pingol in his decision.  In reference to Plaintiff's psychological ability to maintain employment, the ALJ wrote:

> "As to contact with co-workers, all these jobs are done individually, not as a team, with some periodic contact but not constant....Similarly, if she could not maintain concentration, she could not perform the jobs. However, few concentration deficits were found at examinations, and Dr. Pingol stated that she seldom had concentration problems (Exhibit 20F)."  (Tr. 24.)

Plaintiff's brief makes much of Dr. Pingol's findings that Plaintiff would have difficulty accepting instructions, responding to criticism, and getting along with co-workers, but ignores many of Dr. Pingol's other findings.  In July 2003, Dr. Pingol found that Plaintiff did not exhibit any signs of psychomotor abnormality, was verbal and reliable, pleasant and cooperative, alert, coherent, relevant, goal directed,  denied suicidal or homicidal ideation, as well as auditory, visual, or tactile hallucinations, that memory was intact, her attention and concentration were "okay", and that she was able to focus for the whole hour of evaluation.  (Tr. 210.)  In a second report, dated February 15, 2005, Dr. Pingol described Plaintiff as "much improved"  (Tr. 221.) The ALJ's reference to Dr. Pingol's report and the positive descriptions of Plaintiff's mental state contained therein make it difficult for one to conclude that the ALJ ignored Dr. Pingol's opinion, or that if the ALJ had placed greater emphasis on Dr. Pingol's findings, he would have decided this case in Plaintiff's favor.

Based on this evidence, this Court concludes that ALJ Friedman's evaluation regarding the credibility of Plaintiff's complaints and testimony is supported by substantial evidence in the record.

## IV. <u>CONCLUSION</u>

For the reasons stated above, this Court finds that Commissioner's decision is supported by substantial evidence and is affirmed.

 S/Joseph A. Greenaway, Jr.             
JOSEPH A. GREENAWAY, JR., U.S.D.J.

Date: December 12, 2008